**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| STATE OF MARYLAND | : | |
| | : | |
| v. | : | Civil Action No. CCB-10-3183 |
| | : | |
| UNIVERSAL ELECTIONS, et al. | : | |
| | : | |

...o0o...

## MEMORANDUM

The State of Maryland has brought this enforcement action against Universal Elections, Inc., Julius Henson, and Rhonda Russell, alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, *et seq.*, in connection with 112,000 anonymous prerecorded telephone calls made to Maryland residents on Election Day, November 2, 2010. Pending before this court is a motion to dismiss filed by the defendants. The issues in this case have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, the motion will be denied.

## BACKGROUND

The State of Maryland has alleged the following facts. Universal Elections is a Maryland limited liability corporation that offers various services to candidates for political office, including broadcasting prerecorded voice messages to voters. (Complaint ¶7.) Julius Henson is an owner and officer of the company, and Rhonda Russell is an employee. (*Id.* ¶¶8-9.) During the 2010 Maryland gubernatorial campaign, the defendants were hired to serve as political consultants by the campaign of candidate Robert L. Ehrlich, Jr. (*Id.* ¶10.)

On or before Election Day, November 2, 2010, the defendants retained the services of Robodial.org, LLC ("Robodial"), a company based in Media, Pennsylvania that provides a

variety of telecommunications services, including voice telephone broadcasting services on

behalf of political clients.  (*Id*. ¶11.)  Through Robodial's website, the defendants uploaded

recordings of the following message:

> Hello.  I'm calling to let everyone know that Governor O'Malley and President Obama
> have been successful.  Our goals have been met.  The polls were correct and we took it
> back.  We're okay.  Relax.  Everything is fine.  The only thing left is to watch it on TV
> tonight.  Congratulations and thank you.

(*Id*. ¶14.)  The defendants also uploaded a list of more than 112,000 telephone numbers to which

Robodial was instructed to deliver the message.  (*Id*. ¶¶13, 15.)  The phone numbers belonged to

Maryland residents, the majority of whom were registered Democrats residing in Baltimore City

and Prince George's County.  (*Id*. ¶¶12-13.)  The message did not identify the caller or disclose

on whose behalf the call was being made.  (*Id*. ¶15.)  The message also did not disclose the

address or phone number of the person or entity that initiated the call.  (*Id*.)  On November 2,

2010, the prerecorded voice message was broadcast to the 112,000 phone numbers on the list

uploaded by the defendants.   (*Id*.)  The State of Maryland alleges that the defendants "omitted

the identifying information required by the TCPA in order to disguise the purpose of their calls."

(*Id*. ¶16.)  If the defendants had "advised voters that the calls were being made on behalf of the

campaign of Robert L. Ehrlich, Jr.," the State alleges, "it would have changed the message

conveyed by the calls – that Governor O'Malley had been successful and did not need the

recipients' votes."  (*Id*. ¶16.)

On November 10, 2010, the State of Maryland sued the defendants in this court for

violating the TCPA.  The defendants filed a motion to dismiss on December 15, 2010, to which

the State responded on December 22.  The defendants then filed a "Supplemental Motion to

Dismiss" on December 28, to which the State responded on January 14.  The defendants replied

on January 19, and the State surreplied on January 25, 2011.[1]  On April 15, 2011, with the

consent of the parties, the United States moved to intervene and filed a brief in support of the

constitutionality of the TCPA.  On May 11, 2011, the defendants filed a motion to stay, although

the motion has no applicability to the defendants' motion and supplemental motion to dismiss.

## STANDARD OF REVIEW

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to

resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."

*Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks

and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.

1999)).  When ruling on such a motion, the court must "accept the well-pled allegations of the

complaint as true," and "construe the facts and reasonable inferences derived therefrom in the

light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

"Even though the requirements for pleading a proper complaint are substantially aimed at

assuring that the defendant be given adequate notice of the nature of a claim being made against

him, they also provide criteria for defining issues for trial and for early disposition of

inappropriate complaints."  *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to

raise a right to relief above the speculative level, . . . on the assumption that all the allegations in

the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (internal citations and alterations omitted).  Thus, the plaintiff's obligation is to set forth

sufficiently the "grounds of his entitlement to relief," offering more than "labels and

conclusions."  *Id.* (internal quotation marks and alterations omitted).  "[W]here the well-pleaded

---

[1] The defendants' January 19 brief was entitled "Response To Opposition To Motion To Dismiss."  (ECF No. 19 (hereinafter "Defs.' Reply").)  The State of Maryland's January 25 brief was entitled "Reply to Response to Opposition to Motion to Dismiss."  (ECF No. 21 (hereinafter "Pl.'s Surreply").)

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, -

- U.S. --, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

## ANALYSIS

The TCPA makes it unlawful for any person to "make any telephone call using any

automatic telephone dialing system . . . that does not comply with the technical and procedural

standards prescribed under this subsection, or to use any . . . automatic telephone dialing system

in a manner that does not comply with such standards."  47 U.S.C. § 227(d)(1).  Among the

"technical and procedural standards" provided by the Act are the following:

> [A]ll artificial or prerecorded telephone messages (i) shall, at the beginning of the
> message, state clearly the identity of the business, individual, or other entity initiating the
> call, and (ii) shall, during or after the message, state clearly the telephone number or
> address of such business, other entity, or individual[.]

*Id*. § 227(d)(3)(A).  The Act authorizes state attorneys general to bring actions to enforce certain

sections of the TCPA, including the identification disclosure requirements in § 227(d).  *Id*. §

227(f)(1).  The Act also confers exclusive subject matter jurisdiction on the federal district courts

over all such enforcement actions.  *Id*. § 227(f)(2).

The State of Maryland has sued the defendants for failing to comply with the

identification requirements when, through Robodial, they sent their Election Day message to

112,000 Maryland residents without providing "the identity of the business, individual, or other

entity initiating the call" or "the telephone number or address of such business, other entity, or

individual."  *Id*. § 227(d)(3)(A).  The defendants admit they hired Robodial, recorded the

message, uploaded the message and list of phone numbers to Robodial's website, and instructed

that Robodial broadcast the message on Election Day.  (Defs.' Mem. at 2.)  They also admit that

the message did not identify who had initiated the call, or provide that person or entity's contact

information.  (Defs.' Reply at 2.)  Nonetheless, they offer various arguments for why the complaint should be dismissed.  The court will address each in turn.

## I.      Political robocalls are not exempt from the TCPA disclosure requirements

The defendants argue that the disclosure requirements in the TCPA do not apply to "political robocalls" (Defs.' Mem. at 7-8) because the Federal Communications Commission (FCC) has exempted such calls from the requirements of the TCPA.  (*See* Defs.' Reply at 6 (citing 47 C.F.R. § 64.1200(a)(2)(ii)).)  Although the FCC has exempted certain calls "not made for a commercial purpose" from a different section of the TCPA—namely, the section requiring "prior express consent of the called party" for certain prerecorded calls, 47 U.S.C. § 227(b)(1)(B)—that exemption does not apply to the identifying requirements of § 227(d).  All calls made using an "automatic telephone dialing system," not just calls made for a commercial purpose, must satisfy § 227(d).

The defendants also cite a bill that has been proposed but not enacted that would require that any auto-dialed recorded call that "promotes, supports, attacks, or opposes a candidate for Federal office" must disclose the identity and contact information of the person making the call or causing the call to be made.  *See* Robocall Privacy Act of 2009, S. 1077, 11th Cong. (2009). As discussed above, however, § 227(d) of the TCPA does not exempt political robocalls.  The plain language applies to "any telephone call using any automatic telephone dialing system."  47 U.S.C. § 227(d)(1).  The fact that an unenacted bill would provide identification requirements specifically for political robocalls does not alter the fact that the Election Day calls fall within the plain language of § 227(d) of the TCPA, and thus are subject to its identification requirements.

**II.    The defendants can be liable under the TCPA even if Robodial placed the calls**

As stated above, the TCPA makes it unlawful for a person to "make any telephone call" that violates the technical standards prescribed by the Act.  47 U.S.C. § 227(d)(1)(A).  The defendants argue that they cannot be liable under this section because the complaint does not allege that they "made" the Election Day calls; rather, it alleges that Robodial placed the calls.

That argument is precluded by the plain language of  § 227(d).  That section requires the FCC to "prescribe technical and procedural standards" for artificial or prerecorded voice messages and expressly instructs that those regulations require that such messages identify "the business, individual, or other entity initiating the call" and provide contact information for "such business, other entity, or individual."  *Id.* § 227(d)(3)(A).  It is unlawful for any person "to make any telephone call using any automatic telephone dialing system . . . that does not comply with the technical and procedural standards," or "to use any . . . automatic telephone dialing system in a manner that does not comply with such standards."  *Id.* § 227(d)(1)(A).  According to the complaint, construed in the light most favorable to the State, the defendants went to Robodial's website, uploaded a pre-recorded message and a list of phone numbers, and directed that Robodial broadcast the message to those recipients.  (Compl. ¶14.)  The message was then broadcast to the 112,000 phone numbers on the list uploaded by the defendants.  (*Id.* ¶ 15.)  The complaint thus alleges that Robodial merely provided the conduit for the defendants' message, similarly to the way in which an email service provider provides the conduit for an email message.  Those factual allegations plainly constitute the "use" of an automatic telephone dialing

system "in a manner that does not comply" with the requirements that messages identify the entity initiating the call.[2]

Moreover, imposing liability for violations of § 227(d) on persons who retain the services of companies like Robodial furthers Congress's purposes in enacting the TCPA. By requiring that automated calls identify the caller at the beginning of recorded messages, § 227(d) allows recipients to quickly decide whether to listen to the remainder of a message or to hang up. This helps protect the privacy of recipients of automated calls and allows recipients to minimize the nuisance of such calls. *See* Telephone Consumer Protection Act of 1991, Pub. L. 102–243 § 2(10) ("Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy."). The identifying information also allows recipients to request not to receive such calls in the future, and to report violations of the do-not-call provisions of the TCPA. *See* 47 U.S.C. § 227(c) (authorizing the FCC to establish "a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations").

Where a caller hires a company like Robodial solely for transmitting unlawful calls, these purposes are furthered much more effectively if the callers are liable for violations than if only the transmitting companies are liable. Indeed, the situation here illustrates why Congress likely intended for persons and entities like the defendants to be responsible for ensuring that automated calls comply with the applicable technical and procedural standards. The State alleges that the defendants wrote, recorded, and uploaded the message and designated a list of recipients, while Robodial merely provided the conduit for broadcasting the message. As the

---

[2] Because the statute prohibits either "mak[ing]" a telephone call or "us[ing]" an automatic telephone dialing system system in violation of FCC standards, and because the allegations constitute the latter, the court need not decide whether the allegations also constitute "mak[ing]" a telephone call.

persons and entity responsible for recording the message, the defendants were in a position to

ensure that the content of the message complied with the TCPA.  It is highly unlikely that

Congress intended to insulate persons and entities like the defendants from § 227(d) liability

while imposing sole liability on broadcasters like Robodial.  For these reasons, if the facts

alleged are true, the defendants would be liable for violating the TCPA.  Therefore, the

complaint states a claim on which relief can be granted.[3]

### III.   Individual defendants can be liable under the TCPA

The TCPA prohibits "any person" from violating the identification requirements set forth

in § 227(d), and authorizes state attorneys general to bring actions against "any person" who has

violated § 227(d).  *See* 47 U.S.C. § 227(f)(1).  The State of Maryland has sued not only

Universal Elections but also Julius Henson and Rhonda Russell for violating § 227(d).  It alleges

that Henson and Russell are personally liable because they were responsible for recording and

uploading the Election Day message, and directing Robodial to broadcast it.

Henson and Russell argue that even if Universal Elections were liable under the TCPA,

the claims against them must be dismissed because they cannot be held personally liable under

the TCPA.  The "any person" language of § 227(d), however, plainly applies to individuals; the

section does not impose liability only on entities.  Moreover, courts that have addressed the issue

have concluded that individuals acting on behalf of a corporation may be held personally liable

for violations of § 227(d) if they "had direct, personal participation in or personally authorized

---

[3] In the alternative, the defendants dispute the plaintiff's version of events and, in an apparent effort to distance themselves from the unlawful calls, ascribe significantly more agency to Robodial.  They seem to argue that Robodial was responsible for receiving the defendants' request, processing the request, and then "sen[ding] the calls into the State of Maryland" (Defs.' Mem. at 12); because Robodial served as an intermediary by placing the calls, the defendants did not themselves "make" the calls.  That factual dispute is, of course, irrelevant for the purposes of this motion to dismiss, when the allegations in the complaint must be taken as true.  Moreover, it is possible that the defendants could be liable even if Robodial had a greater role in making the calls than the State of Maryland alleges, such as if Robodial was acting under the defendants' express authority and thus as their agent.  In any event, the court need not address whether that scenario would constitute a violation of § 227(d), because the facts as alleged state a claim on which relief can be granted.

the conduct found to have violated the statute." *Texas v. Am. Blast Fax*, 164 F. Supp. 2d 892,

898 (W.D. Tex. 2001); *see also Baltimore-Washington Tel. Co. v. Hot Leads Co.*, 584 F. Supp.

2d 736, 745 (D. Md. 2008) (observing that if the defendants, who were the same defendants as in

*American Blast Fax* and in both cases were sued for sending unsolicited faxes, "actually

committed the conduct that violated the TCPA, and/or . . . actively oversaw and directed the

conduct," they could be held individually liable for the statutory violations); *Covington &*

*Burling v. Int'l Mktg. & Research, Inc.*, 2003 WL 21384825, *6 (D.C. Super. Ct. 2003) (holding

that corporate executives were personally liable because they "set company policies and

over[saw] day-to-day operations" and were "clearly involved in the business practices" that

violated the TCPA).[4]

    Indeed, when a corporation violates a statute, individuals who "voluntarily and

intentionally caused the corporation to act" in violation of the statute can be personally liable for

those statutory violations, such as when a director votes for the commission of an unlawful act.

*Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1144 (4th Cir. 1975) (holding

that individual directors of a community swimming pool could be liable under 42 U.S.C. § 1981

if they "personally participate[d]" in the alleged discrimination against black applicants); *see*

*also Fed. Trade Comm'n v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005) (holding

that if a corporation violates the Federal Trade Commission Act, individual officers are also

liable if they "participated directly in the deceptive acts or practices or had authority to control

them"); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999)

("A corporate officer or director is, in general, personally liable for all torts which he authorizes

or directs or in which he participates, notwithstanding that he acted as an agent of the corporation

and not on his own behalf. . . . Having [violated the Lanham Act, the individual defendant could

---

[4] An unpublished opinion is cited not for any precedential value but for the consistency of its reasoning on this issue.

not] hide behind the corporation where he [was] an actual participant in the tort."); *United States v. Pollution Abatement Servs., Inc.*, 763 F.2d 133, 135 (2d Cir. 1985) ("In light of the clear congressional intent to hold 'person[s]' liable for violations [of the Rivers and Harbors Appropriation Act of 1899], we see no reason to shield from civil liability those corporate officers who are personally involved in or directly responsible for statutorily proscribed activity.")  These cases reflect the general tort rule that "corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body." *Metromedia Co. v. WCBM Maryland, Inc.*, 610 A.2d 791, 794 (Md. 1992) (quoting *Tedrow v. Deskin*, 290 A.2d 799, 802-03 (Md. 1972)); *see also id.* at 795 n.2 ("Maryland case law on corporate officer liability for torts committed by the corporation is consistent with the law as it exists in the great majority of jurisdictions.").

Moreover, if an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force. *See Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991) (holding that individual defendants can be personally liable under the Interstate Land Sales Full Disclosure Act, which applies to "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision," 15 U.S.C. § 1701(5), because "[t]o hold otherwise would defeat the purpose of the Act, since it is the officers of the corporation who are behind the alleged fraud").  If Henson and Russell had recorded and sent the Election Day message on their own behalf, unaffiliated with Universal Elections, they surely would be liable under the TCPA. *See Am. Blast Fax*, 164 F. Supp. 2d at 898 (observing that if the individual defendant there had sent "unsolicited fax advertisements on his own behalf . . . he surely would face personal liability under the TCPA").  Congress cannot

have intended for such individuals to avoid personal liability by affiliating themselves with an entity such as Universal Elections.

It is true that officers or employees are generally not liable for statutory violations based solely on their corporate offices or ownership.  *See Tillman*, 517 F.2d at 1144 ("If a director does not personally participate in the corporation's tort, general corporation law does not subject him to liability simply by virtue of his office."); *Riverside Mkt. Dev. Corp. v. Int'l Bldg. Prods., Inc.*, 931 F.2d 327, 330 (5th Cir. 1991).  The State of Maryland does not, however, seek to hold Henson and Russell liable based solely on their positions as owner/officer and employee.  Rather, it alleges that Henson and Russell are liable because they were directly involved in the TCPA violations.  Accordingly, the cases Henson and Russell cite concerning personal liability for the debts or contractual obligations of a corporation are not persuasive.  (*See* Defs.' Mem. at 11 (citing *Ferguson Trenching Co. v. Kiehne*, 618 A.2d 735, 743-44 (Md. 1993); *A.B. Corp. v. Futrovsky*, 267 A.2d 130, 137 (Md. 1970); *Selby v. Williams Constr. Servs*, 948 A.2d 132 (Md. Ct. Spec. App. 2008); *Colandrea v. Colandrea*, 401 A.2d 480, 486-87 (Md. Ct. Spec. App. 1979)).)

For these reasons, if the State of Maryland can prove that Henson and Russell directly participated in or authorized the statutory violations, they may be personally liable under the TCPA.  Accordingly, the claims against them will not be dismissed.

## IV.     Robodial is not a party required to be joined if feasible under Rule 19(a)

The defendants argue that the complaint should be dismissed because Robodial has not been joined as a defendant.  Federal Rule of Civil Procedure 19(a)(1) provides:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

In cases where "a person who is required to be joined if feasible cannot be joined," the court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

The defendants argue that Robodial is a party "required to be joined if feasible" because the Election Day call was "initiated . . . from its facilities" and because a judgment against the defendants "would be binding on Robodial." (Defs.' Mem. at 14.) These arguments are easily rejected. The Attorney General's allegations against the defendants are independent of any potential claims against Robodial. Even if the defendants used Robodial's services to broadcast the recorded message, and even if the Attorney General could potentially sue Robodial in connection with the same alleged violations, Robodial's absence from this case does not affect this court's ability to "accord complete relief among existing parties." Moreover, disposing of this action would not "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations," nor would it "as a practical matter impair or impede [Robodial's] ability to protect" any interest it might have in the litigation. Fed. R. Civ. P. 19(a)(1)(B)(i). Even if the defendants are ultimately found liable, and even if a judgment against the defendants could be relevant to a subsequent action against Robodial, Robodial would not be bound by any judgment or factual or legal determination made in this action because it is not a party to this action. Therefore, Robodial is not a party "required to be joined if feasible." Accordingly, Rule 19 does not require that Robodial be joined as a party, or that this court proceed to determine whether the action should be dismissed under Rule 19(b).

**V.      The complaint is otherwise sufficient to state a claim on which relief can be granted**

The defendants argue that the complaint does not a state a claim on which relief can be granted because "No where in the Complaint does the Plaintiff state that anyone of the over 112,000 citizens of Maryland heard or received the robocalls that were alleged to have been initiated by anyone of the defendants."  (Def.'s Mem. at 7.)  The complaint alleges, however, that "the prerecorded voice message quoted above was broadcast to the phone numbers of more than 112,000 Maryland residents chosen by Defendants" (Compl. ¶15) and that "[h]ad Defendants advised voters that the calls were being made on behalf of the campaign of Robert L. Ehrlich, Jr., it would have changed the message conveyed by the calls – that Governor O'Malley had been successful and did not need the recipients' votes."  (*Id.* ¶16.)  The TCPA does not require that an attorney general include individual names of persons who received calls that violate § 227(d). The allegations are sufficient to state a claim.

The defendants also argue that they cannot be liable under § 227 because, although the Election Day call allegedly went to 112,000 people, those people received only one call, and the TCPA only prohibits repeated calls to the same individuals.  They do not cite any authority for this proposition, other than the entire section of the Code of Federal Regulations codifying regulations the FCC has promulgated under the TCPA.  The language of § 227(d), however, plainly applies to "any telephone call."  47 U.S.C. § 227(d)(1).  There is no requirement that a defendant have made multiple calls to the same individual violating the technical requirements of the Act for the defendant to be liable under § 227(d).

**VI.     The TCPA does not violate the First Amendment**

The defendants argue that § 227(d) of the TCPA violates the First Amendment because it is a content-based burden on political speech that cannot withstand strict scrutiny.  The State of

Maryland argues that § 227(d) is content-neutral and therefore subject only to intermediate scrutiny, and is valid under that intermediate standard.

### A. Level of scrutiny

When a statute or regulation imposes content- or viewpoint-based restrictions on speech, the law may be upheld only if it withstands strict scrutiny. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 808, 813 (2000). In contrast, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 642 (1994). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based," while laws that regulate "without reference to the ideas or views expressed are in most instances content neutral." *Turner Broad. Sys.*, 512 U.S. at 643. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. Moreover, a law remains content-neutral even if in a particular case it applies to political speech. *See, e.g.*, *Clark v. Comm. for Creative Non-Violence*, 468 U.S. 288, 294-95 (1989) (holding that a National Park Service regulation prohibiting camping in Lafayette Park and the Mall was content neutral, even when applied to prohibit demonstrators from sleeping in those parks in connection with a demonstration intended to call attention to the plight of the homeless); *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 535-37 (1987) (holding that a statute prohibiting certain

commercial and promotional uses of the word "Olympic" was not a content-based restriction on speech, even though it allegedly "suppresse[d] political speech" by restricting the defendants' ability to "convey a political statement about the status of homosexuals in society"); *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (holding that a city ordinance that prohibited the posting of signs on public property was content neutral; the application of the ordinance to the posting of political campaign signs on utility poles did not render it content-based).

Here, the TCPA section at issue imposes technical requirements that apply to all artificial or prerecorded telephone messages.  47 U.S.C. § 227(d)(3).  These provisions do not target any group or form of speech, or place greater restrictions on the speech of the defendants than those placed upon anyone else using an automatic dialer, and thus apply "without reference to the ideas or views expressed." *Turner Broad. Sys.*, 512 U.S. at 643.  Accordingly, the identification requirements imposed by § 227(d) are content neutral.

This conclusion is supported by the opinions of other courts addressing First Amendment challenges to autodialer disclosure requirements of the TCPA or similar state statutes, which have consistently held that the requirements are content neutral.  *See, e.g.*, *Bland v. Fessler*, 88 F.3d 729, 733 (9th Cir. 1996) (holding that a California statute that prohibited auto-dialed calls unless "preceded by a live operator who identifies the calling party and obtains the called party's consent to listen to the prerecorded message" was content-neutral because it "simply prescribe[d] a *method* of communication, not its content.") (emphasis in original); *Moser v. FCC*, 46 F.3d 970, 973 (9th Cir. 1995 ("Because nothing in [§ 227(b) of the TCPA] . . . distinguish[es] between commercial and noncommercial speech, we conclude that the statute should be analyzed as a content-neutral time, place, and manner restriction."); *Van Bergen v. Minnesota*, 59 F.3d 1541,

1551 (8th Cir. 1995) (holding that a Minnesota auto-dialer law, as applied to a gubernatorial

candidate, was content neutral because "[a]ll callers, whatever the content of their messages may

be, must have either the express or the implied consent of the subscriber, or consent obtained

through a live operator, to deliver an ADAD message," and the only groups exempted from those

requirements "are defined by their relationship to the caller, not by the content of their

messages"); *see also Turner Broad. Sys.*, 512 U.S. at 645 (holding that a federal statute requiring

cable operators to carry local broadcast channels was content neutral because although "the

must-carry provisions distinguish between speakers in the television programming market" by

"compelling [cable operators] to offer carriage to a certain minimum number of broadcast

stations," "they do so based only upon the manner in which speakers transmit their messages to

viewers, and not upon the messages they carry"); *Am. Target Advertising, Inc. v. Giani*, 199 F.3d

1241, 1247 (10th Cir. 2000) (holding that a Utah statute requiring that all professional

fundraisers identify "those involved in the solicitation process" and "the purpose and method of

solicitation," among other information, was content neutral because it did "not authorize a

content-based review of the charitable mailings").

The cases the defendants rely upon to argue that the TCPA identification requirements

are subject to strict scrutiny all involve laws that specifically regulated the content of speech, and

therefore are inapposite.  *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 338 n.3,

347 (1995) (applying strict scrutiny to Ohio statute that prohibited the distribution of anonymous

political materials designed to promote or defeat a political candidate or issue); *United States v.*

*Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812-13 (2000) (applying strict scrutiny to a provision

of the Telecommunications Act that required cable operators to restrict sexually explicit channels

because the provision singled out "particular programming content" as well as "particular

16

programmers"); *Burson v. Freeman*, 504 U.S. 191, 197 (1992) (applying strict scrutiny to a Tennessee statute that prohibited solicitation of votes and display of campaign materials within 100 feet of polling place entrances because, under the statute, "[w]hether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a political campaign").[5]

For these reasons, the TCPA identification requirements challenged in this case are content neutral, and thus subject to intermediate scrutiny.

### B. *Narrow tailoring to a substantial governmental interest*

Content-neutral laws are valid so long as (1) they "further[] an important or substantial governmental interest" that is "unrelated to the suppression of free expression" and (2) the law is narrowly tailored to that interest, *i.e.*, "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broadcasting*, 512 U.S. at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).[6] To satisfy the second prong, a law "need not be the least speech-restrictive means of advancing the Government's interests"; rather, it is valid so long as it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (internal quotation marks and alteration omitted). The State of Maryland has identified three governmental interests

---

[5] The remaining cases the defendants cite—*Buckley v. Valeo*, 424 U.S. 1 (1976); *FEC v. Colorado Rep. Fed. Campaign Comm'n*, 533 U.S. 431 (2001); and *FEC v. Massachusetts Citizens for Life*, 479 U.S. 239 (1986)—are also distinguishable, because they all involved challenges to the Federal Election Campaign Act of 1971, and thus involved restrictions specifically targeted at political speech. Moreover, although the Court in *Buckley* did consider reporting and disclosure requirements in the Federal Election Campaign Act, the plaintiffs there did not challenge those requirements as "per se unconstitutional restrictions on the exercise of First Amendment freedoms of speech and association," but rather as overbroad, 424 U.S. at 60-61; thus, the Court did not consider whether the disclosure requirements were subject to strict scrutiny.

[6] Intermediate scrutiny is applied to any content-neutral law, whether one that imposes a restraint on speech that is "incidental," *O'Brien*, 391 U.S. at 377, or one that imposes a "time, place, or manner restriction" on speech." *See Clark*, 468 U.S. at 298 (observing that the *O'Brien* test "is little, if any, different from the standard applied to time, place, or manner restrictions").

it argues are advanced by the TCPA's identification requirement: residential privacy, an

informed citizenry, and effective law enforcement.

### i. Protecting residential privacy

The Supreme Court has repeatedly recognized that the government has a substantial

interest in protecting residential privacy. *See Frisby v. Schultz*, 487 U.S. 474, 484 (1988) ("The

State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of

the highest order in a free and civilized society.")  "One important aspect of residential privacy is

protection of the unwilling listener." *Id.*  "Although in many locations, we expect individuals

simply to avoid speech they do not want to hear, the home is different." *Id.* (citation omitted).

"[A] special benefit of the privacy all citizens enjoy within their own walls, which the State may

legislate to protect, is an ability to avoid intrusions." *Id.*; *see also Hill v. Colorado*, 530 U.S.

703, 717 (2000) (noting that the government may seek to protect the "interests of unwilling

listeners in situations where 'the degree of captivity makes it impractical for the unwilling viewer

or auditor to avoid exposure'") (citing *Erznoznik v. Jacksonville*, 422 U.S. 205, 210-211, n. 6

(1975)); *Nat'l Fed'n of the Blind v. Fed. Trade Comm'n*, 420 F.3d 331, 339-340 (4th Cir. 2005)

(concluding that "safeguarding residential privacy" is "a substantial government interest that the

democratic process is entitled to protect").

By requiring that prerecorded, automatically dialed calls identify who has initiated the

call and provide contact information, § 227(d) allows recipients to terminate the call and/or

contact the caller to prevent future calls, thereby allowing recipients to "protect their private

time." *Nat'l Fed'n of the Blind*, 420 F.3d at 343.  Indeed, Congress specifically expressed its

concern about residential privacy when it enacted the TCPA.  It observed that "automated

telephone calls that deliver an artificial or prerecorded voice message are more of a nuisance and

a greater invasion of privacy than calls placed by 'live' persons" because such callers "cannot interact with the customer except in preprogrammed ways," and "do not allow the caller to feel the frustration of the called party."  S. Rep. No. 102-178, at 1972 (1991).

Moreover, § 227(d) is narrowly tailored to protecting that interest.  In *National Federation of the Blind*, the Fourth Circuit concluded that an FTC regulation that required that charitable fundraisers transmit their name and phone number to caller ID services was narrowly tailored, observing that "[j]ust as a peep-hole in a door allows residents to pre-select whom they wish to welcome into their homes, so caller ID information allows residents to pre-select whom they wish to speak to on a particular evening."  420 F.3d at 342-43.  Similarly, § 227(d) allows recipients to decide quickly whether to hang up or to listen to the remainder of the message, and thus allows recipients to "effectively block[] the calls that cause the problems the government seeks to address."  *Id.* at 342 (alterations omitted).

Other courts that have considered technical requirements for prerecorded calls, including requirements that all calls begin with a live operator identifying the caller, have concluded that such requirements are narrowly tailored to the substantial government interest in protecting residential privacy.  In *Bland v. Fessler*, the Ninth Circuit upheld a live-operator requirement because it promoted the state's "significant interest in protecting the public from [automatic dialing and announcing device (ADAD)] calls, whether received at home or at work," 88 F.3d at 734, and was narrowly tailored because, even if alternative means exist for protecting residential privacy, they would be less effective in promoting that interest than the live-operator requirement.  *Id.* at 736.  Similarly, in *Van Bergen*, the Eighth Circuit held that a live-operator requirement protected "the privacy and tranquility of the home," 59 F.3d at 1555, and was narrowly tailored because it "allow[ed] the continued use of ADADs while protecting the right of

19

the recipient to choose whether or not to receive a message" and to "request that the caller not call again," left "ample alternative channels for communication," and imposed only "marginal[]" increased costs on callers. *Id.* at 1555-56; *see also Frisby*, 487 U.S. at 487-88 (upholding a municipal ordinance that banned picketing of particular homes because it specifically protected individual residents, who were "figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing [are] left with no ready means of avoiding the unwanted speech"). The disclosure requirements here are less restrictive than the auto-dialer statutes upheld in *Bland* and *Van Bergen*. The statute permits callers, including those calling on behalf of political candidates, to use auto-dialers without acquiring recipients' prior consent or using live operators. Auto-dialers must simply identify the caller at the beginning of the call and provide the caller's identifying information sometime during the call.

For these reasons, § 227(d) is narrowly tailored to the substantial governmental interest in the protection of residential privacy.

### ii.  Promoting disclosure to avoid misleading the recipients of recorded calls

The State also argues that the disclosure requirements promote an "informed citizenry" because they "help the recipients of the calls to better evaluate the message that is being communicated." (Pl.'s Opp'n to Supp. Mot. to Dismiss at 11.) The State argues that by requiring that prerecorded calls identify who has initiated the calls, the TCPA prevents such calls from misleading the recipients. Absent the identification requirement, they argue, callers can "disguise the true purpose of their calls" (*Id.* at 12), as allegedly happened here.

In *National Federation of the Blind*, the Fourth Circuit considered a Federal Trade Commission regulation that required that fundraisers "identify the charity on behalf of which the request [was] being made" and "promptly explain that they are seeking donations," among other

requirements.  420 F.3d at 336 (citing 16 C.F.R. § 310.4).  These requirements, the court held,

furthered the substantial government interest in "protecting charities (and the public) from

fraud."  *Id.* at 339.[7]  Similarly, in *American Target Advertising*, the Tenth Circuit upheld a Utah

statute that required that professional fundraisers disclose the identity of "those involved in the

solicitation process" as well as "the purpose and method of solicitation" because those

requirements, among others, "enable Utah citizens to make informed decisions concerning their

charitable donations" and thereby further the state's interest in "combating fraud."  199 F.3d at

1248.

Moreover, the Supreme Court has held in the election campaign context that the

government has a significant interest in promoting an informed electorate.  *See Buckley v. Valeo*,

424 U.S. at 66-67 ("[D]isclosure provides the electorate with information as to where political

campaign money comes from . . . in order to aid the voters in evaluating those who seek federal

office.") (internal quotations omitted); *Citizens United v. FEC*, __U.S. __, 130 S. Ct. 876, 916

(2010) (rejecting a First Amendment challenge to the disclaimer and disclosure provisions of the

Bipartisan Campaign Reform Act of 2002 and noting, "[D]isclosure permits citizens and

shareholders . . . to make informed decisions and give proper weight to different speakers and

messages.").  The fact that the calls here occurred in the context of an election campaign—on

Election Day, no less—renders the government interest in preventing citizens from being misled

through inadequate disclosure particularly strong.

---

[7] In *National Federation of the Blind*, the court was applying a test that is slightly different from the traditional intermediate scrutiny test, one the Supreme Court had applied specifically to professional charitable fundraising. The test requires that the regulation further "a sufficiently strong, subordinating interest that the government is entitled to protect," and be "narrowly drawn to serve the interest without unnecessarily interfering with First Amendment freedoms."  420 F.3d at 338 (alterations omitted).  The court noted, "It is unclear whether this standard amounts to 'strict scrutiny' . . . or to the less stringent 'intermediate scrutiny.'"  *Id.*  Nonetheless, because at minimum the court was applying intermediate scrutiny, it is clear that the Fourth Circuit considers the governmental interests promoted by the FTC regulations, including "prevent[ing] fraud" and "safeguarding residential privacy," *id.* at 339, to be "substantial."

By requiring that automatically dialed calls identify the person or entity that initiated the call, § 227(d) allows recipients to decide whether to listen to the message to evaluate more accurately the content of the message.  In fact, the allegations in this case aptly illustrate why knowing the identity of the person or entity initiating a call is necessary for a recipient to avoid being misled.  The State of Maryland claims that by omitting the identifying information required by the TCPA, the defendants "disguise[d] the true purpose of their calls—to suppress votes for a political opponent by telling voters that their votes were no longer necessary."  (Pl.'s Opp'n to Supp. Mot. to Dismiss at 12.)  "Had the Defendants complied with these requirements" by disclosing that they were political consultants employed by the Ehrlich campaign, the identifying information allegedly "would have changed the message conveyed by the calls." (*Id.*)  If recipients had known that the defendants, rather than the O'Malley campaign, had initiated the calls, they would have been less likely to decide not to vote.

For these reasons, the TCPA's identification requirements promote the substantial governmental interest in preventing misleading automated calls, an interest that would be achieved less effectively absent the disclosure provisions of § 227(d).

### iii.  Promoting effective law enforcement

The State argues that § 227(d) also promotes effective law enforcement by "facilitat[ing] government enforcement of numerous other prohibitions contained in the TCPA, as well as other similar state laws regulating persons who use automatic dialers."  (*Id.* at 9.)  The Supreme Court has observed in the election law context that "recordkeeping, reporting, and disclosure requirements" further the governmental interest in effective law enforcement because they assist the government to "detect violations" of those laws.  *Buckley v. Valeo*, 424 U.S. at 68.  Similarly, the TCPA's identification requirements allow government agencies, such as the Attorney

General, to quickly and easily determine the person or business responsible for automated messages that violate the technical requirements of the Act.  (*See* Declaration of Richard Hindman, Division Chief, Telecommunications Consumers Division, Enforcement Bureau, Federal Communications Commission, Intervenor's Ex. D, ¶9 ("[T]the FCC has a strong enforcement interest in being able to quickly and efficiently track down violators of the TCPA, and the two identification requirements—which the Commission has incorporated in 47 C.F.R. § 64.1200(b)—play a central role in allowing called parties to accurately report the parties who are responsible for specific violations, thereby assisting the Commission in taking enforcement action after complaints are received.").)  The government's interest in detecting TCPA violations "would be achieved less effectively absent [the identification requirements in § 227(d)]" and thus "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *Turner Broadcasting*, 512 U.S. at 662.

For these reasons, § 227(d) does not violate the First Amendment.

## CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss will be denied.  A separate Order follows.

May 25, 2011                                               /s/
Date                                                       Catherine C. Blake
                                                           United States District Judge