IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND,
OFFICE OF THE ATTORNEY GENERAL

v.                                              Civil No. CCB-10-3183

UNIVERSAL ELECTIONS, INC., ET AL.

**MEMORANDUM**

The State of Maryland brought this civil enforcement action against Universal Elections, Inc., Julius Henson, and Rhonda Russell, alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, in connection with 112,000 anonymous prerecorded telephone calls made to Maryland residents on Election Day, November 2, 2010. On May 25, 2011, this court denied defendants' motion to dismiss, finding that political robocalls are not exempt from TCPA disclosure requirements and that the TCPA, as applied in this case, does not violate the First Amendment.

On May 11, 2011, defendants filed a motion with this court to stay proceedings pending resolution of the partially parallel criminal charges brought by the Maryland State Prosecutor against defendant Henson. Defendants argued that Henson's Fifth Amendment privilege in the state court criminal proceedings would be threatened by discovery in this civil case. Concluding that legitimate Fifth Amendment concerns could be dealt with appropriately as they arose, the court denied the motion to stay on July 7, 2011. Discovery proceeded.

Now pending is the State of Maryland's unopposed motion for summary judgment. The State requests a finding that defendants knowingly violated the TCPA and are therefore liable for

treble damages. The motion requests a reduced damages award of $10,424,550. Upon review of the pleadings and the applicable case law, the court determines that no oral argument is necessary. *See* Local Rule 105.6. For the following reasons, summary judgment will be granted and damages will be awarded in the reduced amount of $1,000,000 as to Henson and Universal Elections and $10,000 as to Rhonda Russell.

## BACKGROUND

Universal Elections is a Maryland limited liability corporation that offers various services to candidates for political office, including broadcasting prerecorded voice messages known as "Robocalls." (Universal Elections Website ("Website"), ECF No. 74-2; Russell Dep. 67, ECF No. 74-3.) Julius Henson is an owner and officer of the company, and Rhonda Russell is an employee who was in charge of business development and campaign operations. (Russell Dep. 6–7, 9–13, 15.) The Universal Elections website claims that the company's employees have "over 100 years of experience in the campaign business." (Website 1.)

Defendants do not dispute the basic facts in this case.[1] In short, the campaign of candidate Robert L. Ehrlich, Jr. hired the defendants as political consultants in the months prior to the 2010 Maryland gubernatorial election. (Politics Today, Inc., and Universal Elections Invoices ("Invoices"), ECF No. 74-11.) As part of their work for the Ehrlich Campaign, Henson and Russell wrote, recorded, and delivered the robocall message that is the subject of this lawsuit. (Russell Dep. 162–70, 192–201.) The message was sent to more than 112,000 Democratic voters on Election Day 2010. (*Id.* at 171–85, 203.) The message stated, in its entirety:

---

[1] The facts of this case, as alleged by the State of Maryland, were reported in this court's decision denying defendants' motion to dismiss. They are repeated in part here.

> Hello. I'm calling to let everyone know that Governor O'Malley and President Obama have been successful. Our goals have been met. The polls were correct and we took it back. We're okay. Relax. Everything is fine. The only thing left is to watch it on TV tonight. Congratulations and thank you.

(*Id.* at 30.) The evidence now in the record, including documentary evidence and deposition testimony from Russell and from members of the Ehrlich Campaign, confirms that the purpose of the message was to suppress the votes of the largely African-American and Democratic populations in Baltimore City and Prince George's County. (*See* Pl.'s Mot. Summ. J. 3–7, ECF No. 74-1; "Politics Today Memo," ECF No. 74-8; Marczyk Dep. 43, 60–64, 82–89, ECF No. 74-7; Russell Dep. 136–45, 155–57; Russell Notes, ECF No. 74-9; Ehrlich Campaign Email, ECF No. 74-10.)[2]

Defendants delivered the message through the account Universal Elections maintained with Robodial.org, LLC ("Robodial"), a Pennsylvania-based company whose automated call services defendants used frequently. (Hampton Aff. ¶ 8, ECF No. 74-4.) Defendant Henson dictated the contents of the message to defendant Russell. (Russell Dep. 165–67.) During that conversation, Russell asked Henson about the authority line she knew to be required under Maryland state law.[3] (*Id.* at 166, 191–94.) Henson told Russell not to include an authority line, ostensibly because the Ehrlich Campaign did not want one included. (*Id.*) Russell then recorded the message, uploaded two large lists of phone numbers of Democratic voters, sent test messages to Henson and to Ehrlich Campaign staffers, and commenced the automated calls. (*Id.* at 91–100, 170, 186–87.) The

---

[2] Defendants have claimed that the goal of the message was to spark last-minute Ehrlich voters to go to the polls, but this explanation can hardly be credited, given the extensive documentary and deposition evidence of the strategy's purpose, as well as the fact that the message was sent only to lists of Democratic primary voters.

[3] Md. Code Ann., Elec. Law § 13-401 requires campaign advertisements to contain an "authority line" providing information identifying the campaign.

message, as delivered, did not include any information identifying the name or address of the caller or the source of funding. (*Id.* at 191–92.)[4]

Robodial's autodialing software showed that a total of 69,497 call recipients received the entire recorded message and 16,976 recipients received only part of the message. (Hampton Aff. ¶¶ 13–14.) The remaining persons who were called never answered their phone or the call otherwise failed. (*Id.*) Over the course of the campaign, defendants submitted invoices to the Ehrlich Campaign for $104,150. (Russell Dep. 158–60; Invoices, ECF No. 74-11.) Of that total, $22,000 was specifically invoiced for the robocall. (Invoices 7–8.)[5]

The first paragraph of Robodial's Terms and Conditions states, among other things: "Customer is responsible for compliance with the Telephone Consumer Protection Act of 1991 (the 'TCPA')." (Hampton Aff. ¶ 6; ECF No. 74-4, at 8.) And defendant Russell admits that she knew about the TCPA restrictions prior to drafting and executing the automated calls. (Russell Interrog. No. 12, ECF Nos. 74-12 & 74-13; Russell Dep. 46–51.) Defendant Henson has refused to answer any questions regarding his knowledge of the TCPA or the legal requirements for campaign advertising. Instead he has invoked his Fifth Amendment privilege against self-incrimination individually and as the designee for Universal Elections.[6]

---

[4] The State of Maryland alleges that Henson "repeatedly prepared and distributed campaign advertisements, including radio ads, handouts and flyers that contained authority lines" for the Ehrlich Campaign during the 2010 cycle. The message at issue in this case was "the only campaign communication that Henson prepared on behalf of the Ehrlich Campaign of which [the State of Maryland] is aware that did not include language identifying the Ehrlich Campaign." (Pl.'s Mot. Summ. J. 10, ECF No. 74-1.)

[5] Defendants were paid for their consulting work earlier in the campaign through another company, Politics Today, Inc. (Invoices 1–6, ECF No. 74-11; Russell Dep. 15.) There is no dispute, however, that the robocall was produced and delivered through Universal Elections. (Invoices 7–8; Russell Dep. 13.) Both companies appear to be owned by Henson, and Russell worked for both companies as part of her employment with Henson. (*Id.* at 6.)

[6] On June 17, 2011, Henson was indicted on four counts of election law violations. Russell was given immunity in the state criminal case. On May 11, 2012, Henson was acquitted of one count of election fraud and two counts of conspiracy to violate Maryland state election laws. He was found guilty, however, on the charge of conspiracy to distribute campaign material without the authority line required by Maryland state law.

On March 15, 2012, the State of Maryland filed a motion for summary judgment in this case. The motion is supported by documentary evidence and deposition testimony from defendant Russell and from Ehrlich Campaign staff. The State argues that defendants violated the TCPA disclosure provision and that the violation was knowing and therefore eligible for treble damages of $1500 per violation. The State calculates that at least 69,497 full-length phone calls were received by voters and thus that the treble damages award would exceed one hundred million dollars. The motion suggests that the court apply the treble damages figure but award only one-tenth of that amount—$10,424,550. (Pl.'s Mot. Summ. J. 21.)

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law.'" *Custer v. Pan Am. Life*

*Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993); *see Johnson v. United States*, 683 F. Supp. 2d 379, 381 (D. Md. 2010). "Thus, the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Custer*, 12 F.3d at 416.

## DISCUSSION

The TCPA makes it unlawful for any person to "make any telephone call using any automatic telephone dialing system . . . that does not comply with the technical and procedural standards prescribed under this subsection, or to use any . . . automatic telephone dialing system in a manner that does not comply with such standards." 47 U.S.C. § 227(d)(1). Among the "technical and procedural standards" provided by the Act are the following:

> [A]ll artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual[.]

*Id.* § 227(d)(3)(A). The Act authorizes state attorneys general to bring actions to enforce certain sections of the TCPA, including the § 227(d) identification disclosure requirements. *Id.* § 227(g)(1). When a State brings a claim, it may recover "actual monetary loss or receive $500 in damages for each violation." *Id.* "If the court finds the defendant willfully or knowingly violated such regulations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the preceding sentence." *Id.*

This court's memorandum opinion denying defendants' motion to dismiss addressed a series of legal questions related to the applicability of the above TCPA requirements to the defendants in this case. The court there determined, *inter alia*, that (1) political robocalls are not exempt from the

TCPA disclosure requirements; (2) persons who retain the services of outside companies like Robodial may be liable under the TCPA, even if the offending calls are transmitted through the outside service; (3) corporations and individual corporate officers may separately be held liable under the TCPA; and (4) the TCPA as applied in this case does not violate the First Amendment. *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 412 (D. Md. 2011).

In this summary judgment motion, the focus now shifts to the sufficiency of the undisputed evidence in the record. A lengthy discussion is unnecessary, as the record is unambiguous. Universal Elections, by and through both Russell and Henson, drafted and sent a message that failed to include the disclosure information required by § 227(d)(3)(A). As Russell's testimony makes clear, both she and Henson were directly and personally involved in the creation of the offending message. Accordingly, they both "actually committed the conduct that violated the TCPA." *Baltimore-Washington Tel. Co. v. Hot Leads Co.*, 584 F. Supp. 2d 736, 745 (D. Md. 2008) (quoting *Texas v. Am. Blast Fax, Inc.*, 164 F. Supp. 2d 892, 897–98 (W.D. Tex 2001)). While Henson refused to answer any questions about his conduct, the documentary evidence in the record and the deposition testimony of Russell and the Ehrlich staffers establish without any doubt that Henson discussed plans to suppress the votes of African-American Democrats, recorded the plan in the strategy memo sent to the Ehrlich campaign, and ultimately dictated and authorized the offending message. Thus, both Henson and Russell, in addition to Universal Elections, may be held jointly and severally liable for any damages this court may award under the TCPA. *See Baltimore-Washington Tel. Co.*, 584 F. Supp. 2d at 745.

The State of Maryland also argues persuasively that Henson and Russell, and therefore Universal Elections, *knowingly* violated the statute. "The Federal Communications Commission has

interpreted 'willful or knowing' under the Telecommunications Act (of which the TCPA is a part), as not requiring bad faith, but only that the person have reason to know, or should have known, that his conduct would violate the statute." *Am. Blastfax*, 164 F. Supp. 2d at 899 (citing *Intercambio, Inc.*, 3 FCC Rcd. 7247 (1988), 1988 WL 486783). Applying that standard here,[7] there is no question that both Russell and Henson knowingly violated the TCPA disclosure requirements. Russell admits that she was aware of the relevant TCPA requirement months, if not years, before the relevant decisions in this case. And she acknowledges that she and Henson actively decided not to include the required identifying information in the message.

During his deposition as the corporate designee of Universal Elections, Henson refused to answer any questions about his knowledge of the statute. Nonetheless, the court may infer from his actions that he acted knowingly. To begin with, in Henson's role as owner and officer of Universal Elections, he undeniably had reason to know of and should have known about the TCPA disclosure requirements. The company's website advertises its extensive experience in the campaign business and the core service of providing automated phone calls. The Universal Elections website offers seven different service packages directly to candidate campaigns, (Website 23), and two additional packages for independent expenditure campaigns. (*Id.* at 25–29.) Every one of the nine different packages offers automated calls like the ones Universal Elections provided to the Ehrlich Campaign. An individual who owns and actively runs a small business with a focus on a heavily regulated industry such as election services must be presumed to have knowledge of the basic federal statutes

---

[7] The Fourth Circuit has not specifically analyzed the "willfully or knowingly" language in the TCPA. In *Baltimore-Washington Tel. Co. v. Hot Leads Co.*, another judge in this district noted that a separate provision of the United States code defines "willful" as "conscious and deliberate." 584 F. Supp. 2d 736, 745 (D. Md. 2008) (quoting 47 U.S.C. § 312(f)(1)). No judge within this district appears to have considered the definition of "knowing" in this context. In any case, the evidence in the record is sufficient to meet the "willful" standard in *Baltimore-Washington Tel. Co.* as well as the "knowing" standard in *American Blast Fax*.

8

and regulations governing those services.[8]

Furthermore, the State of Maryland is entitled to an adverse evidentiary inference from Henson's invocation of his Fifth Amendment privilege against self-incrimination. Henson refused to respond personally to any interrogatories or document requests, or to the request for a deposition. And, as the corporate designee for Universal Elections, he refused to answer all of the questions relevant to his knowledge of the TCPA and other regulatory requirements. In a criminal case, no inference can be drawn from a defendant's refusal to testify. But the "prevailing view" is that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Here, Henson's refusal to answer basic questions about his knowledge corroborates the reasonable inference that he had knowledge of the relevant TCPA regulations through his extensive campaign experience.[9] Combined with the other evidence, including Russell's deposition testimony, this leaves no genuine dispute that Henson knowingly and willfully violated the statute.[10]

The State of Maryland does not attempt to demonstrate actual damages in this case. Rather, the State urges the court to apply the statutory damages of $500 per violation, trebled to $1500 per violation because the actions met the knowing and willful standard. Because the plain language of the statute states that it is unlawful to "make any telephone call . . . that does not comply" with the

---

[8] Indeed, the Universal Elections website contains references to other statutes and regulations, such as 11 C.F.R. 100.16(a), which defines "independent expenditure." (Website 25.)

[9] The court observes from media coverage that Henson did testify at his criminal trial, where he apparently claimed that a member of the Ehrlich Campaign instructed him not to include an authority line. *See* Ben Mook, *Same Facts, Different Outcome*, The Daily Record, May 14, 2012, at 7B.

[10] The court also notes that a finding of scienter is not necessary to the final damage award in this case, which is discussed below. Even if the court determined that no evidence existed to support the claim that Henson knowingly violated the statute, the base calculation of damages in this case (approximately $34 million) would exceed the amount

disclosure requirements, each phone call made should be considered a separate violation under the Act. Robodial's phone system shows that phone calls were made to and received in full by at least 69,497 voters. Thus, the base damages award would be more than $34,000,000. If trebled because the violations were knowing, the award would exceed one hundred million dollars. Here, instead of requesting the maximum allowable damages, the State of Maryland requests only one tenth of this amount, or $10,424,550, which is less than a third of the amount the statute would authorize even if the violation were not willful or knowing.

Unlike the Fair Debt Collection Practices Act, the TCPA contains no upper limit on damage awards. *See* 15 U.S.C. § 1692k(a)(2)(B) (limiting class damages to the lesser of 1% of net worth or $500,000). At some point, however, statutory damage awards may violate the Fifth Amendment guarantee of due process or the Eighth Amendment's prohibition of cruel and unusual punishment. The Supreme Court has held that statutory penalties violate due process "only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66–67 (1919). After analyzing the "numerous public harms addressed by the TCPA," another judge in this district recently held that "the statutory penalties under the TCPA are not 'obviously unreasonable' and are not 'so severe and oppressive' as to violate due process." *Pasco v. Protus IP Solutions, Inc.*, 826 F. Supp. 2d 825, 2011 WL 5965834, at *10 (D. Md. 2011) (quoting *Williams*, 251 U.S. at 67)); *see also Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1167 (S.D. Ind. 1997) (finding that "§ 227(b)(3)(B), which provides for a minimum penalty of $500 for each violation of the TCPA, does not violate the Due Process clause of the Fifth Amendment"). This court agrees.

---

requested by the State of Maryland.

While the TCPA's damages provisions appear constitutional on their face, damages may become unconstitutional as applied in an individual case. In such situations, a damages award may violate due process or constitute an "excessive fine" under the Eighth Amendment. *See Pasco*, 2011 WL 5965834, at *10 (citing *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 264–65 (1989)); *see also Korangy v. U.S. F.D.A.*, 498 F.3d 272, 277 (4th Cir. 2007) (noting that the Eighth Amendment, though traditionally applied to criminal penalties, may also apply to certain civil penalties).[11] For example, in *Texas v. Am. Blastfax, Inc.*, the court found that an award of approximately $ 2.34 billion "would be inequitable and unreasonable." 164 F. Supp. 2d at 900. To remedy the problem, the court in that case interpreted the damages provision as providing for "up to" $500 per violation and adjusted the award based on the actual cost of an unsolicited fax, which resulted in a final award of $459,375 plus attorney's fees. *Id.* at 901; *see also Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 778 (N.D. Ill. 2008) (noting that if the defendant "were able to show that the statutory damages are in fact so excessive as to be improper, the appropriate remedy would be a reduction of the aggregate damage award, not a dismissal").

An award of the magnitude requested by the State of Maryland is not without precedent. *See* Yuri R. Linetsky, *Protection of "Innocent Lawbreakers": Striking the Right Balance in the Private Enforcement of the Anti "Junk Fax" Provisions of the Telephone Consumer Protection Act*, 90 Neb. L. Rev. 70, 93 (2011) (citing cases). For example, in 2001, a Georgia state court entered a judgment

---

[11] In *Korangy v. U.S. F.D.A.*, the FDA sought a total of $1,058,000 in monetary sanctions from a physician and his office for violations of the Mammography Quality Standards Act. 498 F.3d 272, 275 (4th Cir. 2007). While the Act authorized a statutory maximum of $10,000 per violation, the FDA reduced its request to only $3,000 per violation out of concern for the defendants' ability to pay. *Id.* The court noted that "[i]f a civil penalty is punitive and thus subject to the Eighth Amendment, it will be found constitutionally excessive only if it is 'grossly disproportional to the gravity of [the] offense.'" *Id.* at 277 (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)). After considering the health risks associated with the defendants' violations, the court concluded the reduced penalty did not violate the Eighth Amendment.

11

of nearly $11.9 million against Hooters of Augusta, Inc. for willful violation of the TCPA. *Id.* at 95. In 2002, the FCC fined Fax.com $5.3 million for TCPA violations. *Id.* at 93 (citing *Fax.com, Inc.*, 17 FCC Rcd 15927, 15927 (2002)). And, in 2001, the Dallas Cowboys settled a TCPA suit for $1.73 million for having sent 125,000 unsolicited faxes offering to sell tickets to football games. *See* Paul J. Batista, *The Perils of Telemarketing under the Telephone Consumer Protection Act: Sending Unsolicited Faxes Costs Dallas Cowboys $1.73 Million, Leaves Dallas Mavericks under Full Court Pressure*, 25 Hastings Comm. & Ent. L.J. 231, 258 (2003).

Nonetheless, without suggesting that a $10 million award would necessarily be unconstitutional, the court in the exercise of its discretion will not hold the defendants jointly and severally liable for the full amount requested by the State of Maryland. To begin with, it would be inequitable and unreasonable to hold Henson and Russell equally liable for the TCPA violations that Henson, an owner and officer, ordered Russell, an employee, to carry out. The court will therefore reduce Russell's liability to $10,000.[12] And, while Henson and Universal Elections should bear a heavier burden, a $10 million penalty is disproportionate to the size of the company and the defendants' presumptive ability to pay. *See Am. Blast Fax*, 164 F. Supp. 2d at 900 (finding the proposed award inequitable as against "two individuals and a fifteen-employee company"). Accordingly, the court will hold Henson and Universal Elections jointly and severally liable for a damage award reduced to approximately one-tenth of the State's request—$1,000,000.

---

[12] The record shows that Henson planned the robocall with the Ehrlich Campaign staff and called Russell with instructions. There is no indication that Russell did anything more than execute orders from Henson.

This sum is higher than the damages ultimately awarded in *American Blast Fax*, but the difference is justified. The court in *American Blast Fax* entered its judgment over a decade ago. Further, it relied on a specific and uncontested figure for the cost of each unsolicited fax. The Universal Elections defendants have provided no similar figure on which the court can rely, nor would such a figure necessarily be appropriate here. The public costs of Universal Elections's violations, though not calculable, are significantly greater than the public costs in *American Blast Fax*. *See Williams*, 251 U.S. at 66 (suggesting consideration of "public wrong" is particularly appropriate when damages will accrue to the state). *Cf. BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996) (noting higher punitive damage awards "may . . . be justified in cases in which . . . the monetary value of noneconomic harm might have been difficult to determine"). In *American Blast Fax*, the defendants' offending conduct consisted of unsolicited fax advertisements for products and services. 164 F. Supp. 2d at 896 (discussing, for example, fax advertisements for the Dallas Mavericks basketball team). Here, through Universal Elections, Henson knowingly violated the TCPA with the express purpose of suppressing the votes of a minority group in a contested statewide gubernatorial election. While Henson's efforts on behalf of the Ehrlich Campaign were ultimately unsuccessful, his actions nonetheless damaged public faith in the democratic process that is at the core of our system of government.

A separate order follows.

   May 29, 2012                                                      /s/
Date                                                         Catherine C. Blake
                                                                 United States District Judge